Per
 
 Curiam.
 

 In the course of this argument, which has been lengthy, a preliminary question pre
 
 *282
 
 sents itself towards its conclusion, Whether the court can determine any matter of fact averred by the bill, and denied by the answer, without the intervention of a jury ? It seems to us that we can. The acts to which we must advert for information
 
 on
 
 this subject are, 1782, c. 11, 1801, c. 6. It never could have been the intention of the first act, that every point of fact contained in the bill and denied
 
 by
 
 the answer, should at all events be tried by a jury, Such a proceeding would produce so much perplexity and difficulty, that a court of equity, instead of contributing to the public good, would operate in a different direction. Common sense, then, would suggest that issues must relate only to such facts as should be thought by the court material, The act of 1801, c. 6, sec, 36 and 40, were intended to regulate the mode of selecting these material points. Under the act of 1782, things in this respect were left in too vague a state, and it was found that great dispute and delay arose from the mode of determining what should be considered material points in a cause ; these disputes too, generally embarrassed a cause upon the hearing; thus fatiguing the minds of the court and jury, with mere preparatory questions. The 36th section of the act, makes it the duty of the attornies on different sides to agree upon issues themselves, as to these material points ; and if they cannot agree, either may apply to a judge, giving him copies of the bill and answer, whose duty it shall be to examine them, and make issues upon such parts of the pleadings as he may deem material. It all this shall have been omitted, and the court, upon final hearing, shall doubt as to matters of fact, they may,
 
 ex
 
 officio, order issues to he tried
 
 instanter.
 
 In this process the trial by jury is carefully preserved, as either party may apply to a judge upon such material points as he may suggest; and no doubt, if such suggestions be of pure matter of fact, they never would deny an issue.
 

 It has been several times determined since the act of 1801, that upon the final hearing, no issues are to be made, except to satisfy the court. It is of great importance in the doing of business, that this should be the case, far it would be useless to have an issue
 
 *283
 
 of fact, if the testimony were altogether on one side; or suppose proof on the side of the plaintiff, where a fact is denied in the answer, agreeably to the established law, the plaintiff cannot have a decree.- What benefit could arise from having a jury ? Suppose you have one, and they find for the plaintiff without any proof, contrary to an established principle of law, would the court be bound by it ? they would not. Nay, they would be obliged to grant a new trial. If contrariety of evidence should take place on the hearing, leaving the fact in a state of uncertainty, then the court would be obliged of course, to order issues instanter, but not otherwise.
 
 *
 

 Note.—In the case of Pember and wife vs. Mathers, 1 Bro. C. C. 52, anno, 1779, lord chancellor Thurlow observes, “ I take the rule to be, that where the defendant in express terms, negatives the allegation of the bill, and the evidence is only one person affirming what has been so negatived, there the court will neither make a decree nor send it to law. Mr. Sugden in his treatise respecting vendors and purchasers, a modern work of merit, page 505, in reviewing the authorities on the subject before us, and particularly the case referred to, which he admits to be the settled law, remarks, that the practice had formerly been, to permit the reading of an answer upon the trial of an issue out of chancery, but since the uniform adherence of the court to the principle referred to in Lord Thurlow’s opinion above, it had been considered improper to read the answer upon such a trial. There can be no doubt, that the practice in England has been uniform since the case of Wakelin vs. Walthal, anno, 1679, 2 Chan. Cas. 8, not to make a decree upon the testimony of one witness alone, when opposed to the answer, whether a trial at law had taken place or not. It is however undestood, that after trial at law, the court would decree, if there appeared circumstances to aid the testimony of the witness. But when those circumstances were strong and convincing, the chancellor decreed without at trial. In ordinary cases, issues are never ordered by the court, unless where doubt exists. This is believed to be law here. It seems important to the happiness of society, that an answer should not be overturned by the testimony of one witness, otherwise a man who had bona fide closed a transaction as he thought, by conforming to the principles of justice, and to settled legal principles and forms ; relying on those principles and forms as furnishing evidence of correctness of his conduct, would be under the necessity of proving, by witnesses, that correctness when called on in a court of equity, if an unprincipled person were procured to swear falsely.-The solemnity of a deed in such a case, would of itself have no effect; a witness to a transaction may have died
 
 *284
 
 or removed and if a person's own answer upon oath,respecting the uprightness of his conduct in the acquisition of his acknowledged rights,were not equal to a single witness,the security of honestly acquired property,and quiet of society would be greatly endangered in the existing state of the world. See 2 Atk. 19. 3 Atk. 407. 1 Vez. 95. 3 Vez. jr. 478. 9 Vez, junr. 284 1 Smith’s, Rep. 219. Hen. & Mun. Rep. 372. Com. Dig. tit. chancery X. 4 v. 1 Call.224, 2 Wash. 530, 544.
 

 Our next enquiry is respecting the covenant of S. Wilson, in the year 1787, to Bishop. But it is urged, that at the time Wilson gave this Bond, he had right to the land, not even an entry. It is true no entry has appeared, though stated in the bill; we must therefore assume the position, that he had not a right to the land, when he gave his obligation to Bishop, but we are all of opinion, as it respects the parties before us, the moment he obtained the grant in the year 1793, this covenant fastened on it, and was as obligatory upon Wilson, as if he had an entry or grant when it was given. If the bond was merely colorable, and intended to defraud creditors or others, is is certain void, but there is no kind of evidence of this. It is clear beyond a doubt, that this bond was founded on a bona fide consideration-whether it were adequate to the value of the land, is not for this court to say. It was valuable, and as Wilson was not embarrassed in his circumstances then, nor for many years afterwards, no evidence of fraud appears. Under these circumstances, Wilson bad a right to take more or less for his land, and whether he sold to his son-in-law or to another, made no kind of difference. That the court have nothing to do with the adequacy or inadequacy of a consideration, when the contract was in good faith, maybe ascertained from the authorities.
 
 (1)
 

 The effect of Langdon's debt will next be considered. No person will say, that the bond to Langdon for land elsewhere, was any lien on the piece now in dispute. The whole dispute will then lie between Langdon's judgment and Bishop's bond; the judgment was only a general. lien, it did not bind any specific tract. Bishop's bond was a specific lien, a valuable consideration having been paid therefor,and from its date, Wilson, in the eye of a court of equity,
 
 *285
 
 was merely the nominal owner ; Bishop in reality was the owner, having paid for it-the vendor was only trustee for the vendee. 1 Eq. Cas. 679, pl.
 
 5,
 
 and authorities there quoted. Therefore, Langdon’s judgment did not bind this land,in the hands of Wilson, the 150 acres we mean.
 
 (2)
 

 It is further objected there is no evidence shewing that the plaintiff is the purchaser of the bond for valuable consideration; the court, under the circumstances of this case, do not think any further evidence than appears, is necessary on this ground. It appears the plaintiff exhibited the bond to the court, and it is appended to his bill
 
 ;
 
 this to us is evidence of ownership, 1 Eq. Cas. 229. pl. 10.
 
 *
 
 By our law, act 1801, c. 6, s. 54, it is lawful to transfer these choses in action. Young Wilson purchased the bond of the obligee, and by his directions it was delivered to the plaintiff. At least, since our act of 1801, the evidence is sufficient, and it is not such a contingent interest as would render it necessary to make other proof of consideration paid. What amount of consideration he paid for it is unimportant, or whether Bishop or any other person gave it to him, having the right, the valuable consideration which Bishop gave, is attached to it.
 

 It has been further objected, that the plaintiff purchased with notice of Bangdon’s judgment; that is never presumed, there must be proof of express notice, constructive will not do, 2 Fonb. 155-6-7,
 
 in notis.
 
 Admitting however, that the plaintiff had notice of this judgment, it would not hinder him from buying the land from Bishop. If Bishop’s claim Were good, there was nothing immoral in buying it.
 

 But it is contended, the court are precluded from enquiring, whether Bishop paid the consideration by the deed from Wilson to the plaintiff. This court will not receive evidence to contradict a deed, but they may receive as to the consideration which will be compatible with it.
 
 (1)
 

 Though Wilson might have received the consideration of Bishop for the bond, his bond was still out, and whoever delivered it up to him, paid the consideration, in effect, to him, and nothing is more common in such cases, than to state in the deed made to
 
 *286
 
 the assignee or holder of a bond, the receipt of the consideration of him.
 

 It is strongly insisted, that if the plaintiff prevail in this case, the situation of creditors will be injuriously affected-far otherwise it appears to the court. Though articles or a bond, be an inferior lien to a mortgage, it is a higher one than a judgment, which is only a general security, and binds no particular tract as a
 
 bona fide
 
 bond for a valuable consideration does; and if either a creditor or
 
 bona fide
 
 purchaser by bond, must lose, it is surely much more reasonable, that a person who has contracted upon the personal credit of another, should lose, than one who had paid for the specific land.
 

 We lay it down as a general principle of law, that the purchaser of land under an execution, takes it subject to the same equity it was subject to in the hands of the debtor, previous to the judgment. Ac
 
 tus legis nemini facit injuiriam.
 

 The plaintiff is entitled to 150 acres called for in the bond, and no more. Let a surveyor therefore be appointed to make a survey of the 197 acres, and make report thereof to the next court by plat; in this way the court will be enabled to lay off the 150 acres, in some regular form to suit the plaintiff, and decree him a right therefor.
 

 *
 

 See 1 Hen & Mun. 93, 372. 1 Wash. 337 Caine's C.E. 96. Littel 32. 2 Gould's Ed. Esp. N. P. 362.
 

 (1)
 

 6 East. 257. 2 Lev. 70. 1 Atk. 188, 190 Cowp. 705. 8 T. R. 529. 1 Fonb. 116, 117, 118, 119. 1 P. W. 277 2 Pow. Cont. 78.
 

 (2)
 

 1 Wil. Ed. Bac.Ab 113 n. Kame's Pr. Eq. 324. 5.
 

 *
 

 See 4 John. Rep. 461.
 

 (1)
 

 See 3 T. R. 474. 1 Vez. 366 1 Eq. C. 232. pl. 7, 8. 4 Mass Rep. 135 4. Hen. and Mun. 113.